IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 20, 2019 Session

## FIONA EISCHEID FLODIN v. TAN SCOTT FLODIN

Appeal from the Circuit Court for Hamilton County
No. 17D1397    L. Marie Williams, Judge

_____

No. E2018-01499-COA-R3-CV
_____

This appeal arises from a divorce.  Fiona Eischeid Flodin ("Wife") filed for divorce from Tan Scott Flodin ("Husband") in the Circuit Court for Hamilton County ("the Trial Court").  Husband, in the latter years of the marriage, was unemployed by his choice. Husband asserted that he contributed by helping Wife with her real estate business.  Wife asserted that Husband's contributions were minimal and that he refused to work despite her urging him to get a job.  After a trial, the Trial Court entered an order finding, *inter alia*, that Husband lived a life of leisure while Wife did the vast majority of the work both for pay and at home.  The Trial Court found all the witnesses credible except Husband. The Trial Court proceeded to award Husband around 38% of the marital estate as well as six months of transitional alimony at the rate of $2,000 per month.  Husband appealed. Husband argues on appeal that the Trial Court erred in its valuation of certain marital assets, in its division of the marital estate, and in not awarding him more alimony than it did.  We find that the evidence does not preponderate against the Trial Court's factual findings.  The values adopted by the Trial Court as to marital assets were within the range of evidence presented.  In addition, the Trial Court appropriately considered the relevant factors in its decisions regarding alimony and the marital estate.  We discern no abuse of discretion or other error by the Trial Court.  We, therefore, affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;
Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and THOMAS R. FRIERSON, II, JJ., joined.

Philip M. Jacobs, Cleveland, Tennessee, for the appellant, Tan Scott Flodin.

Phillip C. Lawrence, Chattanooga, Tennessee, for the appellee, Fiona Eischeid Flodin.

# OPINION

## Background

Husband and Wife, after dating for six years, were married in 2001. No children were born of the marriage. Wife, originally a bartender, went on to become a successful real estate agent. Wife earns $186,000 per year in her job. Wife also is college-educated. Husband worked at a tile and granite company at the beginning of the marriage. The most that Husband ever earned while working there was around $35,000. In 2009, Husband was laid off. Husband asserts, as he has throughout, that he contributed to the marriage by helping Wife with her business. Wife's consistent position has been that Husband's contributions were minimal and that he refused to work despite her urging him to get a job.

In either event, the marriage broke down. Shortly before the end of the marriage, Husband became deeply upset upon discovering that Wife had kissed another man. In June 2017, Wife filed for divorce. Wife's brother thereafter came to live with her and assist her. This case was tried in November of 2017. Trial centered on the parties' respective contributions to the marriage, the valuation of marital assets, as well as Husband's prospects of making a living moving forward. We proceed to review the pertinent testimony.

Wife, age 44, testified that she works as a real estate agent 10 to 12 hours a day, seven days a week. Regarding Husband's work history, Wife testified as follows:

> Q. All right. And so did Mr. Flodin work for Pinnacle and The Tile Store for a period of time during the marriage?
> A. Yes, sir.
> Q. What period was that?
> A. Well, during -- he didn't -- he hasn't worked at The Tile Store since -- ten years. Nine -- nine years.
> Q. Okay.
> A. They actually -- they put him on a commission only, and he wasn't producing anything, and so they let him -- they let him go.
> Q. What year was that?
> A. It was probably 2008.
> Q. Okay. What work did he do after 2008?
> A. Nothing to get paid for.
> Q. All right. There's been a suggestion that he did something in your business that was of value. What did he do to assist you?

-2-

A. He would put up signs occasionally, go to the office, get lock boxes, put in a check. When I shattered my heel, I couldn't walk. I'd sit in the driveway and he would open the door to people that I had introduced him to [sic] to show the house because I was non-weightbearing.

Q. Well, how much time did this activity consume where he was assisting you?

A. Maybe six hours a week. Maybe. Not even that. Sometimes I'd even get my photographer to put up my signs or I'd put up my signs. So not a lot. He doesn't know how to turn on a computer, write a contract, get on the MLS. When the Beck house was in operation, rental, I did every single rental agreement on the computer. Printed off the receipts. Wrote the receipts. Sent the people their directions. Wrote it on the calendar. Did -- I mean, stack -- thousands of rental agreements in the 13 years that it was owned. On top of my real estate.

Q. All right. In terms of what his activities were, he spent -- would you say the six hours a week is an average or is that the most or. . .

A. If he spent more -- or less time playing video games and actually getting a license and helping me, it might have been more.

Q. Well, what did he do to occupy himself from the time he quit working until now?

A. Played hours and hours of Call of Duty, video games, watching Fox News, watching pornography. He would clean the Beck house. That was his job, is what he's saying. It's a two-bedroom house. It takes a maximum of two hours to do it. And sometimes he would call me when I'm working to come help him do it. He'd get my friends over to help him clean. He'd wait to the last, knowing it was vacant and that check in was coming in and he'd wait till the day of, when he had four days to do it. And then complain that it was completely dirty and trashed and -- when he had days to clean that two-bedroom house.

***

Q. Now, what encouragement did you give him about getting a job?

A. I asked multiple times. I said, I'm tired. I'm getting burned out. I'm sick of paying for everything. I said, if you want to help, get your real estate license. This was years ago. And he said, well, I didn't graduate high school. I said well, then -- I didn't realize that at the time. And I said, well, get your GED. Went and got a book. He never opened it.

Q. Do you know of any job applications that he made after he quit working in the tile business?

-3-

A. No, sir. He worked at another tile store very briefly for, I think, a phone, but they -- that didn't last but a few months.

Q. What does he do on a daily basis? What is his routine?

A. He gets up; goes down to Mr. Zip and buys a 70 ounce diet Coke; starts playing video games and watching Fox News. He'll normally go to Krystal and get breakfast at Krystal, like a biscuit and gravy or -- that's stuff I don't like. We would go to lunch. I'd go back to showing houses, doing what I do. He'd be -- sometimes I'd come home for lunch and he'd be in bed. And I'd hear the dogs barking so I knew he was in bed taking a nap. And he said he needed to have a nap. I witnessed him watching pornography. And the Fox News was on 20 -- all -- all the time. I couldn't stand it. He wouldn't go out with me, so I would go out with my friends, because he wouldn't never leave the house, basically.

Husband, age 51, took the stand. According to Husband, he and Wife agreed that it would be better for him to help her with the real estate business than for him to get a job, which was "plan B." Husband contends that he played a major role in building the marital residence, worked on the parties' vacation rental property, and was a regular "fixture" around Wife's office helping Wife. Husband testified, in part:

Q. Okay. And what did Mrs. Flodin -- what was plan B to Mrs. Flodin?

A. A job.

Q. Okay. And what was plan A?

A. Plan A for me was to develop these -- keep these properties running and clean the vacation rental.

Q. Okay. At any point after 2010 did she tell you that we needed to go to plan B, which is you entering the work force?

A. Yes. Off and on. Whenever it would get slow in the real estate industry in her real estate business when she would lose listings or sell everything she had, she would bring up plan B.

Q. And leading up to the separation in 2017, was that a topic that was on the table that you needed to get a job and plan B needed to go into play?

A. No. We hadn't really talked about it that much, because I was so busy working on the house.

Q. Okay. All right. Why didn't you go back into the work force after 2010?

A. Because it was in my belief that the money I was making or was capable was making was more or less a wash in the form of tax -- taxes. You know, we'd have to pay somebody over a hundred dollars to clean the vacation rental each time, which would defeat the purpose of having one in the beginning. And she needed help showing houses and putting up signs,

picking them up, some of which were Soddy Daisy all the way to Coalmont, Tennessee, down into LaFayette. She couldn't be two places at one time. And we had pets and I had lawns to mow, bushes to cut, pressure washing to do, decks to fix, you know. That's why.

Q. How often would you have projects like fixing the deck where you got paid by a third party between 2010 and 2017?

A. Where I got paid by a third party. There weren't any.

Q. Okay. And how often were you mowing lawns for money?

A. I didn't.

***

Q. Okay. There's been testimony about your consumption of video games. On average how much video games did you play and when would you play those games?

A. I would usually get up at 6:00, sometimes 5:00 in the morning and play for two or three hours until she gave me an assignment or I had some other work to do around the house, like take the dogs to the vet or take myself to the doctor, get the car washed so Fiona could show a house with it. I always maintained the vacation rental. So there's -- it's almost daily.

Q. Okay. We'll come back to that.

A. Okay.

Q. In terms of the video games, did you spend hours --

A. Yeah.

Q. Did you spend all day playing video games?

A. No.

Q. Tell the Court how much time you spent?

A. Yeah. I would play two or three hours per day. Uh-huh. And the specific times I can tell you were in the mornings. Occasionally on -- in the afternoon. And then after dark. Instead of going to a bar, I would stay home and play the game and watch football.

Q. Okay.

A. Or watch Fox News.

Q. Was your consumption of video games an issue that Mrs. Flodin expressed to you during the marriage that you needed to stop or curtail?

A. Yes.

Q. Did you comply with her wishes?

A. No.

***

-5-

Q. All right. Why didn't you go back and get your GED?
A. Why didn't I? Because I figured Fiona and I were going to last forever and just go ahead and -- it wasn't out of my will to go and get one. But we stayed pretty busy, you know.

Licensed clinical psychologist William Wray ("Wray") testified for Husband. Wray testified regarding Husband's health problems and prospects for work. Wray testified, in part:

Q. Can you detail that?
A. Yes. I found -- he reported to me several health problems. One was a -- a problem with insulin dependent diabetes. He described -- I typically hear from folks that have insulin dependent diabetes -- that he would become fatigued or confused at times and have to sometimes check his blood sugars more regularly and, of course, watch his diet, that sort of thing. He gave me a history of anxiety problems going back to childhood. He attributed -- he said the panic episodes first started related to childhood asthma. And then he also described a family history that was not ideal where there were some abandonment issues there. He said the recent problem in his marriage and the pending divorce had exacerbated some of those anxiety issues. . . .

***

Q. Do you have any findings with reference to his age and how that directly affects his capacity to work or the jobs that he can fulfill?
A. The main -- the main consideration I had, given his age -- and this is pretty standard -- I felt he should not be doing heavy work. And beyond that, you know, he was telling me about -- subjectively he was talking about having problems with forward flexing with, you know, reaching with much lifting. So really I looked at jobs that were lighter in demand, lifting, moving 20 pounds. I found a good number of jobs within that category. I did not mean for the listings that I have there to be exhaustive. So -- and there may be other heavier jobs that he -- he could -- he could perform.
Q. Okay. Can you talk just briefly -- I think you rated him on your training code configuration a 434 -- and just how that interplays with what jobs you suggested he could obtain?
A. Yes. When you look at a job title, it will list the -- the level of reasoning. And that's on a six point scale. So a four would be, you know, average kinds of abilities. And so really I looked at jobs that were within those codes. Sometimes a person gets physically injured and they lack the

reading, language, or math reasoning skills to act at lighter kinds of employment.

Q. And did you draw a conclusion as to what jobs, though it's not exhaustive, you think that he could obtain at that income at what those jobs produce in our economy?

A. I listed some general income information. And essentially what I found was that the -- and I used the mean wage information for Chattanooga. And this is updated in May of 2016. So it wasn't fully current, but it was the most current I could find. I found that -- and these are mean salaries for Chattanooga. I found that for sales and related occupations the mean hourly wage is $17.46 per hour. For building and grounds cleaning and maintenance occupations, the mean hourly wage is $10.86 per hour. And for construction occupations the mean hourly wage is 19.66 per hour. I also give a reference, if you were looking at a particular job, where we could look up a particular job title and get that mean salary information from Chattanooga.

Mark Boatner ("Boatner"), a vocational rehabilitation counselor, testified for Wife on the subject of Husband's prospects for work. Boatner testified, in part:

Q. In addition to those jobs that Dr. Wray delineated in his report, what other jobs, in your opinion, are available to Mr. Flodin and what salary ranges do you feel would be appropriate for his level of skill?

A. Well, sir, I will say that looking at current census data for the Chattanooga, metropolitan, statistical area, considering unskilled and semi-skilled light strength rated jobs, there are over 41 and a half thousand trial unskilled and semi-skilled light strength rated job titles existing in the Chattanooga area. That's 41,200. And these would have a salary range anywhere from about 19 and a half thousand a year to about 30,000 a year. There are also 10 and a half thousand unskilled and semi-skilled sedentary strength rated jobs that would have similar salary range. And that could be anything from working as a receptionist to do telemarketing work or data entry or appointment clerks, things of that nature. There were also some skilled jobs that I did not -- I mean, I looked at the, for instance, retail store manager jobs that Mr. Flodin had done in the past for apparently over -- over five or six years or so and had some training there. In the Chattanooga area and, again, the most current census data that's available to folks like myself and Dr. Wray is from May of 2016. This information from the census bureau comes out annually in May, but it takes a while for the software originators to get it updated. The most current data I've got is mean salary for retail store managers in the Chattanooga area is 36,590, for

-7-

instance. There are a number of other jobs, sales clerk jobs, just entry level jobs that you would see at Walmart or the shoe store, or whatnot, these are semi-skilled jobs at light level strength. They have a mean or average pay of about $23,000 a year. There are other jobs that Mr. Flodin had done in the past when he worked with the pest control service doing sales. Those jobs, the mean annual income for folks that sell pest control services, $43,590 in the Chattanooga area. And that's pretty much the range. There are some other jobs -- let's see -- that are similar. And, again, I did not do a full transformable skills analysis list, every possible job, but I think when I say entry level up to semi-skilled jobs, that will be consistent with the past work and the educational attainment. But for instance, jobs such as a sales representative for home furnishings, selling kitchen supplies, kitchen remodeling jobs, and furniture, the median -- or mean wage there is 57,400 a year in the Chattanooga area. So I listed a number of jobs kind of piggybacking off of the jobs that Dr. Wray had noted from Mr. Flodin's past work.

Another area delved into at trial was the value of certain marital assets, including the parties' Manning Street property. Mark Hite ("Hite"), a real estate agent and expert witness for Wife, testified that the Manning Street property was worth $620,000. Hite stated, in part:

Q. How does the exercise that you've done in deriving an opinion of value of the 403 East Manning Street house compare with what you do on a daily basis in order to provide practical, objective advice to people you represent as buyers and sellers?
A. It is the same process.
Q. All right.
MR. LAWRENCE: I'd offer him as an expert, Your Honor.
MR. JACOBS: My objection may go to weight and not admissibility, but he's not actually a real estate appraiser.
THE COURT: You anticipated my ruling completely. Yes. I understand your qualifications challenge, and I understand we don't have evidence of certification as a real estate appraiser and that training. However, based on his experience, I will accept his opinion as an expert and your objection does go to weight.
MR. JACOBS: Thank you, Your Honor.
THE COURT: Okay.
BY MR. LAWRENCE:
Q. So you were describing the comparability of various properties to the subject property in this case?

A. Yes, sir.

Q. And the criteria that you used to determine comparability relates to size, is that right?

A. Size. Age. The school district in which the -- or the school zone, particularly in Normal Park Elementary School, in which this property and the seven other properties are located. And then from there the fit and finishes, because as someone who does this daily, there are differences in builder grade versus upgraded-type property like the subject property.

Q. Okay. And certainly Mr. Jacobs, opposing counsel, can ask you about these various comparable sales, but after having evaluated the material that you've reviewed, did you draw a conclusion as to the value of the 403 East Manning Street residence?

A. Yes, sir, I did.

Q. And what did you conclude the value to be?

A. $620,000. And that was derived, number one, by taking the average dollars per foot of the seven closed properties, which came in at $143.94 per foot, times what we have ascertained as the living square footage of 3900, which would place the property at 560,000. Then we compared room by room, bathrooms, kitchen, fit and finishes, as well as curb appeal to the seven comparables and upgraded an additional $60,000 as additional appeal in a fair market appraisal, which estimated the house at $620,000.

Q. So on a purely mathematical basis using a multiplier of the average square foot price by the square footage, the value would be less?

A. Yes, sir.

Q. But you have --

A. I've actually upgraded that based upon a careful examination of the subject property versus the seven other homes that have sold.

Q. And is that based upon your experience and knowledge about the real estate market in Hamilton County, Tennessee?

A. Yes, sir.

Another marital asset in focus was Wife's 8.5% interest in Greater Downtown Realty, LLC. Wife placed her stock's total value at $134,400. Husband submitted evidence from Linda Carlton ("Carlton"), the person who handles the company's finances, placing the stock's value at $150,365.

In April 2018, the Trial Court entered its final judgment of divorce. The Trial Court, recognizing the parties' stipulation as to grounds, declared Husband and Wife divorced. The Trial Court awarded Wife around 62% of the marital estate, which had a net value of $940,113, to Husband's 38%. The Trial Court also awarded transitional alimony to Husband at the rate of $2,000 per month for six months or until the Beck lot

was sold, whichever occurs first. The Trial Court attached to its judgment its detailed memorandum opinion, which provides in pertinent part:

The Court heard many hours of testimony from the parties and from witnesses with personal knowledge of the parties. The Court observed the demeanor of the witnesses and weighed the testimony of the parties and witnesses. The witnesses other than Tan Flodin were credible. They were-straightforward when examined about the opportunities to observe the parties. Mrs. Flodin was much more straightforward and consistent in her answers than was Mr. Flodin.

Wife is 44 years of age . . . and Husband is 51 years of age . . . They were married September 29, 2001, having been in a relationship for six years prior to the marriage. This is a first marriage for both parties and there are no children born of this marriage and neither party has any children. Wife has earned a Bachelor's Degree from UTC and completed one year of a Master's program. She had a double major in Psychology and Sociology in college. She ceased her education to pursue a career selling real estate beginning in 2000. While obtaining her education and throughout her life, she had been employed. Husband completed 11 and one-half years of high school and has taken no steps to obtain additional education or to increase his earning power despite encouragement to do so by his Wife.

At the time the parties met, Mrs. Flodin was a bartender at Sticky Fingers restaurant and Mr. Flodin was a manager of a retail store. He lost that job and at the time of the parties' marriage in 2001, he was working in the installation and fabrication aspect of a tile and granite company. He also had worked in a pest control business and Mrs. Flodin was a real estate agent.

Mrs. Flodin advanced in her real estate career. There is no dispute that she consistently works diligently. The undisputed evidence established she works seven days a week and often 10 to 12 hours a day at her work. During the marriage, she invested $39,000.00 of marital assets which were earned through her work endeavors to buy 6.5% of a Keller Williams partnership. She subsequently increased her ownership share to 8.5%, again using marital funds attained through her work endeavors. Mrs. Flodin has greater vocational skills, employability, and earning capacity than does Mr. Flodin.

Mr. Flodin last worked at a salaried position in 2008 or 2009, at which time he went on a commission basis and subsequently was discharged from that employment. Since that time, he has not worked at a wage paying job despite evidence indicating he was a good employee and

could be productive. From substantial credible evidence, the Court finds that Husband simply prefers to play video games, watch Fox News, and drink alcoholic beverages to working outside the home. He did little to nothing to attempt to obtain employment after his discharge and limited his contributions to the family endeavors to sometimes picking up checks, putting out/picking up signs for Mrs. Flodin, and related runner type activities a few hours each week. On a limited number of occasions, he showed a house for her.

Until 2009, Mr. Flodin made an equal effort to contribute to the fiscal health of the marriage. While his earnings did not equal those of Mrs. Flodin, he expended a reasonable effort.

The Court finds no credible evidence that the parties made a joint decision that Mr. Flodin would not be employed after his 2009 loss of job. Mrs. Flodin encouraged and urged him to get a job. She recommended he get a GED and a real estate license. He did neither. The Court finds Mrs. Flodin assumed the responsibility for any and all financial needs or obligations of the household. The contribution Mr. Flodin made to the household was minimal after 2009. He did assist Mrs. Flodin in her real estate business sporadically. His minimal contributions are despite his self-proclaimed abilities to supervise construction and assist in construction as well as assist his wife in her employment. He has displayed historically strong skills in manufacturing and fabrication of tile and some skills in sales. The evidence establishes he simply chose not to pursue those modes of employment or develop others. Accordingly, his earning capacity is substantially less than that of Mrs. Flodin. He claims his significant work and supervision of the renovation projects were valuable contributions to the marital estate. The Court finds his contentions are exaggerated. He did not transfer those skills to wage earning or income generating endeavors.

Neither party has made a tangible or intangible contribution to the education, training, or increased earning power of the other party. Mr. Flodin's occasional efforts in assisting his wife have not made any significant contribution to her earning power.

Mrs. Flodin has a substantially greater ability for future acquisition of capital assets and income.

The Court finds there is no dispute Mrs. Flodin made the majority of the contributions to the acquisition, preservation, and appreciation of the marital estate. As referenced above, Mr. Flodin did make some efforts in improving the real estate investments of the parties and assisted her some in her real estate. His time input was insubstantial. After 2009, Mrs. Flodin was responsible for the most significant efforts in that regard.

-11-

It is not unusual for the Court to, in accordance with the applicable statute, find the contribution of a party who is not a wage earner but rather stays at home to be considered as making an equal contribution to the marriage. However, the evidence is clear Mr. Flodin did not contribute to the marriage as a homemaker or, after 2009, as a wage earner. Mrs. Flodin did all of the cooking, shopping, cleaning, and tending to the home. Mr. Flodin, at most, cleaned a rental house on occasion, drove through Krystal for his breakfast, and ran some errands for Mrs. Flodin.

Both parties have health issues which do not materially impede their ability to earn: Mrs. Flodin suffers from Lupus and Sjogren's Syndrome and Husband is diabetic, has IBS, and complains of back pain. Mrs. Flodin also is seeking the services of a psychologist for anxiety related to this divorce. Neither party's physical condition is an impediment to work. Mr. Flodin was examined by Dr. William Wray for an employment assessment. The opinions of Dr. Wray are based in large part on Mr. Flodin's self-reported symptoms of diabetes, anxiety, chronic back pain, and IBS and how they interfere with his work. The Court finds Mr. Flodin historically less than credible in his recitation of his medical history. The medical records contain documentation of the diagnoses of these conditions but little documentation of any limitation on his ability to earn. Rather, the medical records document excessive alcohol intake and failure to abide by medical recommendations.

This history is the basis of the assumptions made by Dr. Wray in reaching his opinion that Mr. Flodin could earn a mean hourly wage ranging from $10.87 to $19.66 per hour. Mark Boatner and Dr. Wray identified job opportunities for Mr. Flodin. Accordingly, the Court finds Mr. Flodin's reasonable earning capacity is $18.00 an hour or $37,500.00 a year.

Mrs. Flodin has demonstrated an earning capacity of approximately $186,000.00 per year. While she has had substantial income, she also has had substantial expenses related to her business. She has been paying to the Husband $2,000.00 per month, provided him with a residence and paid other expenses for a total of $4,826.12 under an alimony *pendente lite* order.

\*\*\*

There was much evidence concerning certain real properties which are no longer owned by the parties. The Court finds the Beulah Avenue property in St. Elmo which was purchased prior to the parties' marriage, the Brass Lantern Way vacant land, and the 612 Druid Drive properties were

-12-

held during and appreciated during the marriage. There are substantial disputes as to what contribution Mr. Flodin made to the appreciation or improvement of these investments. The Court finds he made some contributions. The proceeds from those investments eventually made their way into the currently held real properties which are 403 Manning Street, 504 Beck Avenue, and the vacant lot at 504 Beck Avenue. The parties have stipulated to a fair market value of the 504 Beck Avenue residence at $292,910.00 and the Beck Avenue lot at $170,000.00. There is a mortgage on the residence at 504 Beck Avenue of $44,460.00.

There is a dispute concerning the fair market value of 403 Manning Street. The Court finds the Wife's fair market value of $620,000.00 substantially more credible than that of the Husband's speculative fair market value. The testimony of Mark Hite substantiates the Wife's opinion.

\*\*\*

In the case before the Court, Mr. Flodin is economically disadvantaged compared to Mrs. Flodin. However, he has not suffered an economic detriment for the benefit of the marriage. While he was working and holding down a job, he was contributing economically to the marriage. It is his contention that his efforts since 2009 have benefitted the marriage. Mrs. Flodin testifies to the contrary.

It is the Court's finding that Mr. Flodin's contribution since 2009 has been minimal. He has contributed a nominal number of hours per week to improving joint real estate investments of the parties and to assisting in Mrs. Flodin's career. However, those efforts have in no way approximated what his holding a full-time job would have generated to the benefit of the marriage or what he could have contributed to the well-being of the marriage non-economically. Rather, he has chosen a life of leisure.

\*\*\*

Transitional alimony has, in effect, been available to Mr. Flodin through the alimony *pendente lite*. He has been provided in the division of assets and liabilities with significant assistance to adjust to the economic consequences of the divorce. Because he is being awarded the Beck residence, he has a place to live. Because of the ordered sale of the lot, that residence will have no encumbrance. He has the ability to earn $3,125 per month. His reasonable needs can be met by his own income when employed. If he utilizes the Beck Avenue property as a vacation rental property, it will generate income as it has historically.

-13-

The Court ORDERS transitional alimony for six months or until the Beck lot is sold, whichever occurs first. This transitional alimony shall be paid at the rate of $2,000.00 per month so Mr. Flodin has income until he is able to obtain employment or the house is paid off. Until the Beck Avenue lot is sold and the proceeds applied to the mortgage on the Beck Avenue residence, Wife shall make the $808.00 monthly mortgage payment and pay the insurance on the house. She shall cover Mr. Flodin's health insurance at the earlier of the end of six months or Mr. Flodin obtaining employment.

***

The Court awards Husband $5,000.00 towards his attorney's fee as alimony *in solido*. Husband is capable of earning sufficient monies to support himself in the lifestyle he enjoyed during his marriage. The Court finds the alimony *pendente lite* paid to him served the function of transitional alimony and the Court also ORDERS transitional alimony and will not re-address that obligation.

Both parties filed motions to alter or amend the judgment. In July 2018, the Trial Court entered its order disposing of the motions, stating:

The Court first will address the motion to alter or amend filed by the plaintiff Fiona Flodin. She asks that certain lump sum payments be permitted to be made out of the proceeds of the sale of the Beck Avenue lot. The Court recognizes the plaintiff has borne most if not all of the expense of the parties' lifestyle throughout the marriage and throughout this litigation. Accordingly, the Court finds her request reasonable and ORDERS the lump sum payment of $5,000.00 to defendant's attorney of record and the sum of $32,000.00 to defendant shall be paid out of the proceeds of the sale of the Beck Avenue property.

Next, plaintiff addresses her concern that the Court awarded the defendant her First Tennessee Bank IRA as part of the equitable division of the assets and liabilities. The Court appreciates her frustration that this account was largely accumulated when Mr. Flodin did not have a job. However, it is incumbent upon the Court to make a fair and equitable distribution of the assets of the marriage. The Court finds this award appropriate. Accordingly, the motion to alter or amend of plaintiff is overruled as to her second request and granted as to her first.

-14-

Defendant/Counter-plaintiff Tan Flodin's motion to alter or amend makes the following requests and the Court resolves each request as follows:

(a) Defendant/Counter-plaintiff requests the 403 Manning Street real estate be sold. This request is denied. The Court finds there was adequate evidence to value it at trial and the Court does not feel it fair and equitable to sell that property as opposed to letting the plaintiff retain her interest in it.

(b) Mr. Flodin complains the actual value of the First Tennessee Bank account number 9755 should be established as the value on the date of trial and should be adjusted. The Court finds the evidence supports the value of $64,000.00 which the Court assigned. This request is overruled.

(c) The Court is asked to change the value assigned to the 8.5 percent interest in the Greater Downtown Realty, LLC. The Court has made a finding which is within the evidence and declines to alter or amend this finding. This request is denied.

(d) Defendant/Counter-plaintiff seeks certain items of personal property. He is awarded all of those requests except for the request for the Lite Speed Titanium Mountain Bike.

Therefore, the defendant/counter-plaintiff's motion is sustained in part and denied in part as is that of the plaintiff.

Husband's transitional alimony terminated in August of 2018. Husband timely appealed.

### Discussion

Although not stated exactly as such, Husband raises the following issues on appeal: 1) whether the Trial Court erred in valuing the marital property, specifically the Manning Street property and the Greater Downtown Realty, LLC stock; 2) whether the Trial Court abused its discretion by failing to distribute the marital property equitably; and, 3) whether the Trial Court abused its discretion by failing to award Husband more spousal support.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Insofar as the issues call for review of discretionary decisions, we apply the abuse of discretion standard. "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches

-15-

an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011).  Regarding witness credibility, our Supreme Court has stated:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000).  "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011).  In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)).  Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness.  *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ––– U.S. ––––, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014).

We first address whether the Trial Court erred in valuing the marital property, specifically the Manning Street property and the Greater Downtown Realty, LLC stock. In *Neamtu v. Neamtu*, No. M2008-00160-COA-R3-CV, 2009 WL 152540 (Tenn. Ct. App. Jan. 21, 2009), *no appl. perm. appeal filed*, this Court discussed our standard of review with respect to the valuation of marital assets.  We stated:

> Once property has been classified as marital property, the court should place a reasonable value on property that is subject to division. *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003).  The parties have the burden to provide competent valuation evidence. *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998).  When valuation evidence is conflicting, the court may place a value on the property that is within the range of the values presented. *Watters v. Watters*, 959 S.W.2d 585, 589 (Tenn. Ct. App. 1997).  Decisions regarding the value of marital property are questions of fact, *Kinard*, 986 S.W.2d at 231; thus, they are not second-

-16-

guessed on appeal unless they are not supported by a preponderance of the evidence. *Smith*, 93 S.W.3d at 875.

*Neamtu*, 2009 WL 152540, at *4.

The Trial Court adopted Wife's value of the Manning Street property of $620,000. Husband suggests it should be valued above $720,000, but that the better solution would be to list the home for sale to determine its fair market value. In this fashion, according to Husband, "Wife could retain a first right of refusal for any offer and could buy Husband out of his portion of the home once the fair market value is determined on the open market."

Husband also cites alleged problems with the testimony of Wife's expert witness, the real estate agent Hite. Husband states that Hite's qualifications are suspect because he is a real estate agent, not an appraiser. Husband also alleges that Hite is biased because he is Wife's colleague at Greater Downtown Realty and did not even charge Wife for his appearance. Finally, Husband points out an inconsistency between the $150 per square foot value used by Hite for the Manning Street property with the $250 per square value used when the parties stipulated the value of the Beck home. We address each separate argument.

The Trial Court stated that it took into account the fact that Hite is a real estate agent and not an appraiser. The Trial Court reckoned with this when weighing the evidence. Hite also thoroughly explained his background and methods. In our view, the Trial Court sufficiently considered Husband's concerns about Hite's qualifications. As to Hite's alleged bias in Wife's favor, Husband has cited no law reflecting that an expert witness's testimony should be discounted totally because that expert is a colleague of the party calling the expert to testify. The Trial Court found Hite to be credible. Husband's allegations of Hite's bias are too ethereal and lack a concrete basis and do not rise to a level sufficient to allow us to substitute our credibility determination for those of the Trial Court as to Hite. Regarding the inconsistency between the value per square foot of the Manning Street property and the Beck home, Husband states only that the inconsistency is inappropriate because "the two homes [are] similarly situated." However, exactly what that means is unclear. Husband fails to adequately explain why it is necessary to apply the same value per square foot for each property. Husband has not pointed to any evidence in the record contradicting Wife's valuation evidence. Instead, Husband attempts only to poke holes in Hite's testimony. We find no merit in Husband's arguments. The Trial Court had a sufficient evidentiary basis upon which to value the Manning Street property at $620,000 as this value was within the range presented to the Trial Court, and the evidence does not preponderate otherwise as to this finding.

-17-

Next, Husband disputes the value adopted as to Wife's 8.5% interest in Greater Downtown Realty, LLC. Wife placed her stock's overall value at $134,400. Husband argues the better and more recent evidence comes directly from Carlton, the person handling company finances. Carlton placed the stock's worth at $150,365. Thus, two competing values were put forward in evidence, and the Trial Court adopted Wife's value. The Trial Court, again, had a sufficient evidentiary basis upon which to adopt this figure which was within the range of the values presented, and the evidence does not preponderate against this finding. For perspective, Wife observes that this is a dispute over around 2% of the net marital estate. We find no reversible error in the Trial Court's valuation of marital assets.

We next address whether the Trial Court abused its discretion and did not distribute the marital property equitably. Husband argues that the Trial Court overlooked key factors in dividing the marital estate 62% to 38% in favor of Wife. Husband asserts that a division closer to 50/50 is in order. A trial court has wide discretion in dividing the interest of the parties in marital property. *Barnhill v. Barnhill*, 826 S.W.2d 443, 449 (Tenn. Ct. App. 1991). Our Supreme Court has instructed:

> [M]arital property must be divided equitably between the parties based on the relevant factors enumerated in Tennessee Code Annotated section 36-4-121(c) without regard to fault on the part of either party. Tenn. Code Ann. § 36-4-121(a)(1). Section 36-4-121(a)(1) requires an *equitable* division of marital property, not an *equal* division. *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002).

*Larsen-Ball v. Ball*, 301 S.W.3d 228, 231 (Tenn. 2010) (emphasis in original).

Husband cites language from two factors as being especially relevant here. First, Husband cites "[t]he age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties." Tenn. Code Ann. § 36-4-121(c)(2) (2017). Husband also cites "[t]he relative ability of each party for future acquisitions of capital assets and income." Tenn. Code Ann. § 36-4-121(c)(4) (2017).

There is no doubt that Husband, as the Trial Court found, is economically disadvantaged relative to Wife. Husband, lacking a college education and out of the workforce for years by his choice, will be unlikely to match Wife in financial terms. This would tend to support a division of the marital estate closer to 50/50 as Husband requests. However, the Trial Court clearly placed significant weight on another factor:

-18-

The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

Tenn. Code Ann. § 36-4-121(c)(5)(A) (2017).

While Husband was employed earlier in the marriage, his contributions after 2009 were minimal at best. Husband protests that he did make significant contributions to the real estate business, but the Trial Court did not credit his testimony and found otherwise. Instead, the Trial Court credited the testimony of other witnesses, most notably Wife, who testified as to Husband's leisurely lifestyle in the back half of the marriage. The Trial Court found further that Husband's health problems would not prevent him from working. To reiterate, after 2009, Husband neither fulfilled homemaking responsibilities nor held a job. The 62/38 division of the marital estate reflects Wife's overwhelming role in growing the parties' assets in contrast with Husband's chosen leisurely lifestyle from 2009 onward. Although not an equal division, we cannot say it was not an equitable division considering all relevant factors. We find no abuse of discretion in the Trial Court's division of the marital estate.

The final issue we address is whether the Trial Court abused its discretion by failing to award Husband more spousal support. The Trial Court awarded Husband $2,000 per month in transitional alimony for a maximum period of six months or until the Beck lot was sold. In his brief, Husband requests $2,000 per month in transitional alimony for a period of 60 months.

Concerning the existing preference toward rehabilitative or transitional alimony in Tennessee, our Supreme Court has discussed:

Tennessee statutes concerning spousal support reflect a legislative preference favoring rehabilitative or transitional alimony rather than alimony in futuro or in solido. *See* Tenn. Code Ann. § 36-5-121(d)(2)-(3); *Gonsewski*, 350 S.W.3d at 109. Not even long-term support is a guarantee that the recipient spouse will be able to maintain the same standard of living enjoyed before the divorce because "two persons living separately incur more expenses than two persons living together." *Gonsewski*, 350 S.W.3d at 108 (quoting *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998)). Although the parties' standard of living is a factor courts must consider when making alimony determinations, *see* Tenn. Code Ann. § 36-5-121(i)(9), the economic reality is that the parties' post-divorce assets

and incomes often will not permit each spouse to maintain the same standard of living after the divorce that the couple enjoyed during the marriage. *Gonsewski*, 350 S.W.3d at 113. Decisions regarding the type, length, and amount of alimony turn upon the unique facts of each case and careful consideration of many factors, with two of the most important factors being the disadvantaged spouse's need and the obligor spouse's ability to pay. *Id.* at 109-10.

*Mayfield v. Mayfield*, 395 S.W.3d 108, 115-16 (Tenn. 2012).

In addition to arguing that the Trial Court failed to consider his need and Wife's ability to pay, Husband also challenges the Trial Court's conclusion that he did not incur an economic detriment for the benefit of the marriage. Tenn. Code Ann. § 36-5-121 provides:

The general assembly finds that the contributions to the marriage as homemaker or parent are of equal dignity and importance as economic contributions to the marriage. Further, where one (1) spouse suffers economic detriment for the benefit of the marriage, the general assembly finds that the economically disadvantaged spouse's standard of living after the divorce should be reasonably comparable to the standard of living enjoyed during the marriage or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

Tenn. Code Ann. § 36-5-121(c)(2) (2017).

Husband's additional arguments track the following statutory factors that courts consider in alimony matters:

(3) The duration of the marriage;

***

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

***

-20-

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; . . .

Tenn. Code Ann. § 36-5-121(i) (3), (8), (9) & (11) (2017).

Husband contends he needs more alimony on these bases: (1) the 16-year length of the marriage; (2) he received only 38% of the marital estate; (3) reasons of health; and (4) Wife kissed another man shortly before filing for divorce, she thus was "directly responsible for the dissolution of the marriage." Husband's economic disadvantage relative to Wife is apparent. In many instances, a discrepancy in abilities to earn such as that seen here, and, in a marriage of such duration, might well justify a more extensive award of alimony. However, given the Trial Court's credibility determinations and its resulting findings of fact, this is not such an instance.

Husband, after 2009, neither was a homemaker nor wage earner. Beyond that point, he suffered no economic detriment for the benefit of the marriage. His contributions were, as found by the Trial Court, "minimal." Wife urged Husband to get a job or earn his GED, but he would not. Wife, meanwhile, works 10 to 12 hours days 7 days a week in the real estate business. Wife also performed the vast majority, if not all, of the work around the home. Husband, by contrast, pursued leisurely activities in lieu of working. This consisted in large measure of playing video games for hours on end while leisurely meandering through his days. Wife already has sustained Husband in his leisure for years. To put it mildly, Husband is not a quintessential candidate for alimony.

And yet, the Trial Court did not deny Husband alimony altogether; it merely limited its amount and duration. In addition, Husband has a home and roughly 38% of a net marital estate worth $940,113. As found by the Trial Court, Husband has the capacity to earn $37,500 per year notwithstanding his health problems. Husband is not being left destitute. The cord of dependency on Wife, however, is being cut. The Trial Court considered the statutory framework on alimony in exercising its discretion. We discern no abuse of discretion or other error. We affirm the judgment of the Trial Court in its entirety.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Tan Scott Flodin, and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE